**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1280**

JENYFER OHAZY FAJARDO-RIVAS; B.N.A.F.,

Petitioners,

v.

TODD BLANCHE, Acting Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 16, 2026 Decided: October 13, 2026

Before WILKINSON and HARRIS, Circuit Judges, and FLOYD, Senior Circuit Judge.

Petition for Review granted; vacated and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Senior Judge Floyd joined.

**ARGUED:** Margot Pyne Kniffin, YACUB LAW OFFICES, LLC, Woodbridge, Virginia, for Petitioners. Sharon Michele Clay, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Ivan Yacub, YACUB LAW OFFICES, LLC, Woodbridge, Virginia, for Petitioners. Brett A. Shumate, Assistant Attorney General, Allison Frayer, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WILKINSON, Circuit Judge:

Jenyfer Fajardo-Rivas fled Honduras after enduring much suffering. She faced the loss of her husband, Jorge, who was kidnapped and likely murdered. She suspects a local gang is responsible because her husband's brother, who defied the gang, was brutally murdered one month earlier. Fajardo-Rivas and her young daughter, the petitioners in this case, came to the United States to evade the gang and seek asylum.

An Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") denied their asylum applications. But after receiving death threats from her husband's suspected killers, Fajardo-Rivas asked the BIA to take a second look. It declined, reasoning that the threats were not enough to warrant reopening the proceedings. As this matter comes before us now, petitioners argue that the BIA's decision denying their motion to reopen failed to properly consider the evidence in their favor. They say the BIA was wrong to conclude that the death threats lacked a nexus to a statutorily protected group, as required by law. 8 U.S.C. § 1101(a)(42)(A).

We agree that the BIA placed too little weight on the evidence of nexus Fajardo-Rivas put forth. In examining whether petitioners make a case for asylum based on new evidence, the BIA must account for the full context of what transpired. We grant the Petition for Review, vacate the BIA's order, and remand for further proceedings consistent with this opinion.

I.

Much of the evidence in this case is uncontested. We begin with an account of the sad circumstances that brought Fajardo-Rivas and her daughter to the United States. We

then review the twists and turns that followed as the government considered their asylum claims.

A.

A local Honduran gang, referred to in the record as the "18th Street Gang," operated in Fajardo-Rivas's neighborhood. Her brother-in-law, Geovanny, vocally opposed the gang. Geovanny sought to drive the gang out of the neighborhood until the night of April 2, 2015, when he was shot dead in the street.

One month later, in the middle of the night, four men impersonating police officers forced themselves into Fajardo-Rivas's home and claimed to have a warrant to arrest her husband, Jorge. The assailants took Jorge at gunpoint, and Fajardo-Rivas fled to a police station to report the crime. She believed that the 18th Street Gang, which had murdered her brother-in-law, wanted to make an example of her family.

A news crew from Honduras's Channel 6 station asked to interview the family about Jorge's abduction. Fajardo-Rivas's mother-in-law appeared on camera. The family took this gamble—identifying themselves in connection with press coverage of the crime—in the hope that Jorge's kidnappers would contact them and demand a ransom. When they heard nothing from the gang, they were forced to assume Jorge was no longer alive. Fearing retaliation, Fajardo-Rivas fled Honduras with her daughter, who was then three years old.

The government disputes petitioners' claim that Geovanny and Jorge were killed by gang members or for reasons related to their opposition to gang activity. Resp. Br. 3. We understand the government not to contest the rest of the story described above.

B.

Fajardo-Rivas applied for asylum in the United States and listed her daughter on her application as a derivative beneficiary. She asked for our country's protection from the persecution of her husband's immediate family members in Honduras, submitting evidence including Geovanny's death certificate, the police report on Jorge's abduction, and affidavits from her mother-in-law and grandmother.

The government denied relief. The IJ who reviewed the case found Fajardo-Rivas's testimony credible but concluded that the evidence was insufficient to establish persecution on account of her membership in a statutorily protected group, the immediate family members of her husband. That conclusion was based on (1) insufficient proof that Geovanny was killed by the gang, and (2) insufficient proof that Jorge was killed by the gang or because of his relationship to Geovanny. The BIA reviewed the IJ's decision and affirmed.

A few months later, Fajardo-Rivas filed a motion to reopen the proceedings based on new evidence. After the IJ rendered its decision, she claimed, the gang delivered death threats. Providing copies of two threatening notes, a police report, and sworn affidavits, Fajardo-Rivas told the BIA that members of the gang promised to kill her and her daughter if they returned to Honduras. The notes, delivered to Fajardo-Rivas's mother in Honduras, labeled Fajardo-Rivas a "snitch," an apparent reference to her choice to report Jorge's abduction to the police and point her finger at the 18th Street Gang.

Fajardo-Rivas's mother recognized tattoos on the faces of those who delivered the threatening notes indicating that they were members of the 18th Street Gang. The notes

further threatened that the gang would kill those who refused to tell them where to find Fajardo-Rivas.

The BIA first denied petitioners' motion to reopen in an order dated August 4, 2022. That order was vacated by this court, and the BIA, on remand, denied petitioners' motion to reopen once again on February 28, 2025.[*] In the 2025 decision, the subject of this appeal, the BIA reviewed the death threats and held that petitioners failed to put forth evidence of persecution sufficient to justify reopening the case.

II.

Tragic circumstances are not by themselves sufficient to demonstrate eligibility for asylum. Congress took a more focused approach. Under the Immigration and Nationality Act, applicants must show "persecution or a well-founded fear of persecution on account of" a protected ground such as "race, religion, nationality," or "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A).

An applicant's immediate family can be a "particular social group." *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011). Persecution occurs "on account of" such a group when membership in the group is "'at least one central reason for' the feared persecution." *Id.* at 127 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

---

[*] This court vacated and remanded the 2022 BIA decision so the agency could correct a discrepancy between the legal standard for motions to reopen and the agency's assessment of the facts. *Fajardo-Rivas v. Garland*, No. 22-1905 (4th Cir. Mar. 22, 2023). Petitioners argue that the BIA's reasoning in its 2022 decision should color how we read the 2025 decision. Pet. Reply Br. 5–7. For purposes of resolving this appeal, we need not determine whether any part of the BIA's 2022 decision, which this court vacated, is relevant to this proceeding.

To establish this "nexus" between group membership and persecution, the claimant's membership in the group need not be the only reason the claimant was persecuted, but it must be more than "incidental, tangential, superficial, or subordinate to another reason." *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009) (quoting *In re J-B-N- & S-M*, 24 I. & N. Dec. 208, 214 (BIA 2007)). The agency's nexus findings are treated as conclusive "unless a reasonable adjudicator would be compelled to reach a contrary conclusion." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017).

Asylum applicants bear an even higher burden when seeking to reopen proceedings based on evidence unavailable at the time of the initial proceedings. The BIA rightly weighs the "strong public interest in bringing litigation to a close." *M.A. v. INS*, 899 F.2d 304, 309 (4th Cir. 1990) (en banc) (quoting *INS v. Abudu*, 485 U.S. 94, 107 (1988)). We review denials of motions to reopen for abuse of discretion, *Abudu*, 485 U.S. at 107, but the BIA "may be held to have abused its discretion if it failed to offer a reasonable explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

In the face of that strict standard, petitioners seeking to reopen proceedings have the burden of proving "a *prima facie* case for an adjustment of status" based on evidence previously unavailable. *Onyeme v. U.S. I.N.S.*, 146 F.3d 227, 234 (4th Cir. 1998). We apply a "reasonable likelihood" test, asking whether the petitioner has shown it reasonably likely that, at a new hearing, the agency would grant the relief sought. *Mouns v. Garland*, 113 F.4th 399, 405–06 (4th Cir. 2024). The BIA has said it is "willing to reopen 'where the new facts alleged, when coupled with the facts already of record, satisfy us that it would

be worthwhile to develop the issues further.'" *Id.* at 408 (quoting *In re L-O-G-*, 21 I. & N. Dec. 413, 419 (BIA 1996)).

III.

The BIA's most recent opinion denied Fajardo-Rivas's motion to reopen on the grounds that her claim of persecution lacked the requisite nexus to a protected group. A credible threat of death categorically qualifies as persecution, *Crespin-Valladares*, 632 F.3d at 126, but the agency found that Fajardo-Rivas could not establish she was persecuted "on account of" her membership in the particular social group of her husband's family. 8 U.S.C. § 1101(a)(42)(A).

The government defends the BIA's decision by framing this case as a personal, private dispute dressed up as family-based persecution. The threatening notes call Fajardo-Rivas a "snitch," suggesting that the gang is retaliating against her for accusing them of abducting Jorge. According to the government, this indicates "personal animus"—anger because she reported the crime—rather than an attempt to target her because of her membership in Jorge's family. Resp. Br. 28.

Yet this case is notable for all the government does *not* contest. Most importantly, the government accepts petitioners' evidence that members of the 18th Street Gang likely delivered the threatening notes. As discussed, the individuals who delivered the notes had tattoos indicating membership in the 18th Street Gang. When asked about the tattoos at oral argument, the government acknowledged that this evidence "does suggest that a gang member actually left the notes." Oral Argument at 24:25–24:45.

The government nonetheless emphasizes it is unclear whether the 18th Street Gang is responsible for Jorge's abduction or Geovanny's murder. *Id.* Fajardo-Rivas has submitted no proof that Honduran authorities identified the culprits of either crime. Without such evidence, the government says, the BIA did not abuse its discretion in determining that Fajardo-Rivas's persecution lacks a nexus to her membership in Jorge's family group. After all, the "gang may well have threatened a non-family member for reporting the kidnapping as well." Resp. Br. at 28.

The government's argument is hard to square with our decision in *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017). The petitioner in *Cruz*, also a Honduran woman applying for asylum, believed her husband was murdered by his employer. *Id.* at 125. Cruz confronted the employer and threatened to go to the police; the employer threatened to kill her if she did. *Id.* In denying asylum, the agency held that the employer's threat constituted "[h]arm meted out by a private actor for personal reasons," so Cruz lacked a nexus tying her persecution to the particular social group of her husband's family. *Id*. at 125–27.

This court disagreed. We held that the agency erred by "shortsightedly focus[ing] on [the employer's] articulated purpose of preventing [] Cruz from contacting the police, while discounting the very relationship that prompted her to search for her husband, to confront [the employer], and to express her intent to contact the police." *Id.* at 129. Just because a non-family member theoretically could have done the same did not alter the conclusion, grounded in the broader context, that Cruz's situation was sufficiently connected to her familial relationship to meet the asylum statute's nexus requirement. *Id.*

We reached a similar result in *Zavaleta-Policiano v. Sessions*, 873 F.3d 241 (4th Cir. 2017), where the asylum claimant's father, who ran a convenience store in El Salvador, was extorted by a gang and fled the country. *Id.* at 244–45. The claimant, who ran an associated convenience store one block away, faced similar threats after her father's departure. *Id.* We held that the BIA erred in denying the existence of a nexus between the petitioner's persecution and her relationship to her father. The agency focused solely on the "articulated purpose" for the threats—extorting money from the family's stores—and failed to address circumstantial evidence indicating that the threats were "intertwined" with the claimant's membership in her family group. *Id.* at 248 (quoting *Cruz*, 853 F.3d at 129). The gang threatened *her* because her father left El Salvador. *Id.* at 249.

To be sure, asylum claimants cannot establish family-based persecution whenever a family member has faced harm. In *Cedillos-Cedillos v. Barr*, 962 F.3d 817 (4th Cir. 2020), we upheld the agency's decision upon facts suggesting a dispute less connected to family bonds. The petitioner faced persecution because he "happened upon the assault" and murder of his brother, and he feared the attackers might come after him as the only witness. *Id.* at 825–26. However, nothing in the record indicated that the petitioner would have been differently situated if he were a witness who did not have a family tie to the victim but "happened upon the assault" all the same. *Id.* at 826. And the assailants never threatened other members of the family or visited the family home. *Id.* Therefore, the petitioner's membership in his brother's family was not "at least one central reason" why his brother's attackers threatened him. *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

With these precedents in mind, Fajardo-Rivas's new evidence compels the conclusion that she has satisfied the nexus requirement. Her relationship to Jorge "was a central reason why she, and not another person," reported his abduction to the police, triggering retaliation. *Cruz,* 853 F.3d at 130. Fajardo-Rivas did not "happen[] upon" the crime, as in *Cedillos-Cedillos*, 962 F.3d at 826. The assailants abducted her husband from the family's home. And they did so, she contends, because of the family's connection to a different opponent of the gang, her husband's brother. Then, years later, the gang sent death threats directed not only at Fajardo-Rivas, but at her daughter and other members of the family. To deny the connection between Fajardo-Rivas's persecution and her family group obscures why she got caught up in this morass.

The government would like us to defer to the IJ's finding in 2018 that Fajardo-Rivas failed to show that the 18th Street Gang was responsible for harming Jorge and Geovanny. But the IJ's finding preceded the death threats. The BIA's 2025 decision does not seriously consider whether, with the benefit of the new evidence, a reasonable inference may now be formed that the gang *did* commit those crimes. The record as a whole now indicates that the gang threatened to kill Fajardo-Rivas and other members of her family, and that gang members are angry at her for accusing them of killing Jorge and Geovanny. That is "unrebutted, legally significant evidence" brought by a claimant we have no reason to think unreliable. *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009).

The evidence Fajardo-Rivas has presented supports this inference. She witnessed her brother-in-law confront the gang. She witnessed her husband's kidnapping. She submitted a death certificate corroborating her brother-in-law's violent death and a police

report corroborating her account of the kidnapping. It stands to reason, then, that when 18th Street Gang members threatened her for involving the police, it was because the gang played a role in the violence visited upon this family.

The BIA's decision did note other circumstantial evidence that could call into question the authorship of the threatening notes. *See* J.A. 5. But the government conceded before this court that the gang likely delivered the notes. *See* Oral Argument at 24:25–24:45; Resp. Br. 28. At no point did the government suggest this court or the agency treat Fajardo-Rivas's new evidence as anything but credible.

Regardless, the BIA placed too much weight on the IJ's pre-death-threat findings and too little weight on petitioners' new evidence. The BIA's focus on the IJ's uncertainty about who committed the underlying crimes—Jorge's abduction and Geovanny's murder—led the BIA to neglect uncontradicted evidence that (1) Fajardo-Rivas gave the police information about those crimes, exposing the gang to scrutiny, and (2) members of the gang, identified by their gang tattoos, threatened to kill her and other members of her family. We must make rational inferences based on this evidence because "[i]t is unrealistic to expect that a gang would neatly explain in a note all the legally significant reasons it is targeting someone." *Zavaleta-Policiano*, 873 F.3d at 248. By glossing over that part of the story, the BIA "disregarded important aspects of the applicant's claim." *Tassi*, 660 F.3d at 719.

IV.

Asylum cases such as these can present a tension between the poignant conditions petitioners flee and the limited sympathy that rules of law and the arid atmosphere of

appellate courtrooms may allow. In this case, however, natural sympathies and law align. Fajardo-Rivas experienced the loss of her brother-in-law and her husband followed by threats to her and other relatives. The evidence shows this long trail of tragedy was bound up in the petitioners' family unit. We in no way dilute the strict test applied by this circuit on motions to reopen, but neither can we close our eyes to the exceptional family-related cruelty it was petitioners' misfortune to face. There is thus a nexus between the gang's threats and Fajardo-Rivas's family group.

On remand, as the BIA reconsiders petitioners' motion to reopen, it should take careful account of the evidence and the continuity reflected in the full story briefly recounted herein. While Congress intended this court's review of motions to reopen to be a deferential one, ensuring that agency adjudicators take due account of relevant available evidence is a core function we are asked to serve. Ms. Fajardo-Rivas and her daughter deserve the benefit of a more thorough look.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*